In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00061-CR
_____

ANDREW LUNA, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 435th District Court
Montgomery County, Texas
Trial Cause No. 17-04-04625-CR

MEMORANDUM OPINION

A Montgomery County grand jury indicted Andrew Luna for the third-degree felony offense of retaliation. *See* Tex. Penal Code Ann. § 36.06 (West 2016). The State alleged two enhancements for prior felony convictions. *See id*. § 12.42(d) (West 2019). A jury convicted Luna, and he elected to have the trial judge assess punishment. Luna pleaded "true" to both enhancements, and after finding him a habitual offender, the judge sentenced Luna to forty years of confinement in the

1

Institutional Division of the Texas Department of Criminal Justice. *See id.* Luna timely appealed and presents one issue arguing it was reversible error to admit evidence for purposes of impeachment after finding the defense opened the door.[1] We affirm the trial court's judgment.

## Background

Responding to a disturbance call, Montgomery County Sheriff's Deputy Cody Lowery testified that when they arrived on the scene, he discovered Luna trying to fight with various people. Deputy Lowery described Luna as agitated, shirtless, and being physically restrained by his brother. The deputy also testified that Luna used vulgarities and made threats towards him. When Deputy Lowery attempted to obtain more information, Luna told him he was suicidal. Deputy Lowery explained that if someone is suicidal, they use an emergency detention order and take them to a local hospital, if the situation calls for it. The deputy handcuffed Luna and placed him in the back of the patrol car to protect Luna and others while completing his evaluation of the situation. As Deputy Lowery spoke with others at the scene, Luna began

---

[1] Appellant framed the issue as "[w]hether the Prosecutor committed reversible error by claiming that the Appellant's [t]rial [a]ttorney opened the door to impeachment of the Appellant's mother as a witness on the issue of the Appellant's character, specifically the peaceableness of the Appellant, and by presenting impeachment evidence consisting of the Appellant's prior felony convictions and current gang affiliation."

repeatedly kicking the back door from inside the patrol car, bending the door and the cage to the vehicle. Lowery testified that because Luna damaged the police vehicle, he decided to take him to jail for criminal mischief.

Deputy Lowery testified, and the video evidence established, that Luna told the deputy, "[y]ou'll be dead in twenty-four hours." Luna made additional threats against Deputy Lowery and his children, although the deputy indicated he did not have children. The deputy said Luna referred to people he knew who could carry out his threats. Deputy Lowery said he felt very threatened, and he told the jury he believed Luna intended for him to feel threatened. The deputy confirmed that Luna referred to him as "the law" multiple times, showing Luna's awareness that Deputy Lowery was a law enforcement officer. Deputy Lowery testified that Luna appeared intoxicated, but law enforcement did not perform any drug or alcohol tests.

Luna's mother, Sylvia Medillin, also testified at trial. She explained that between 7 and 8 p.m. that evening, Luna came home with some of his friends, who told her there was something wrong with Luna. Medillin testified that Luna began having "a meltdown[,]" so she called his brother to help restrain him. Medillin called 911 for an ambulance, but the police came instead. Medillin testified she had never seen Luna do what he did that night, but before this incident he had "some breakdowns," and she tried to get him some help.

During Medillin's testimony, the following exchanges with defense counsel

took place:

Q. Okay. And let me ask you this: So do you believe basically speaking from what you saw and from what you observed[—]was Andrew acting basically normal, the way he normally acts, or was he going through something at that point?
A. Oh, no, he was way out of character.

. . .

Q. Now, let me ask you this: Are you familiar with the fact that even on that day[,] Andrew actually threatened you?
A. Yeah.
Q. Do you remember what he said basically?
A. "I'll kill you," something like that.
Q. And did you take that as a threat?
A. No.
Q. Why not?
A. Because I knew he wasn't in his right state of mind, I would guess. I mean, that's what I was thinking. I'm his mom. I know my son.
Q. Okay.
A. He wouldn't hurt me. Never has.

. . .

Q. Okay. Okay. You've heard the video; is that correct?
A. Yeah.
Q. And you heard what he told the officer; is that correct?
A. (Witness nods.)
Q. Okay. Now, you don't condone it, do you –
A. No.
Q. – if somebody threatens an officer?
A. Oh, no.
Q. Okay. So what did you think when you heard it?
A. I was – I was afraid for him.
Q. Okay. For who?

4

A. Well, for Andrew.

Q. Why?

A. Because I figured – I thought maybe they would make him mad or something if it was any kind of threat, but anybody that seen Andrew that day would just know. I mean –

Q. Okay.

A. – he was acting out of character. It wasn't anybody in their right mind speaking.

Following these exchanges, the State argued that Medillin's testimony that Luna acted out of character that evening and that he would never hurt her "opened the door" for the admission of other evidence as to Luna's character. As a result, the State sought to introduce evidence of Luna's past criminal offenses and gang membership. In a hearing outside the jury's presence, the defense objected and argued the door was not opened regarding "peaceableness" and that his mother testified regarding Luna's mental state at the time of the alleged offense, "not his conduct or peacefulness[.]" The court did not make an express ruling to Luna's objection at the conclusion of the hearing. However, after the jury was seated and the trial resumed, the defense did not object when the State began questioning Medillin about Luna's gang membership and prior felonies.

**Analysis**

In response to Luna's issue, the State argues that he failed to preserve the complaint for our review. We agree.

5

To preserve error for appellate review, Texas Rule of Appellate Procedure 33.1 provides that a party must complain to a trial court "by a timely request, objection, or motion that . . . state[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[,]" and the trial court ruled on the objection expressly or implicitly. Tex. R. App. P. 33.1(a). We recognize courts have long rejected "hyper-technical requirements for error preservation." *See Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016). However, to preserve error based on the improper admission of evidence, a party must object "each time inadmissible evidence is offered unless the complaining party obtains a running objection or obtains a ruling on his complaint in a hearing outside the presence of the jury." *Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008) (citations omitted); *see also Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991) (citations omitted).

Because Luna failed to object to the testimony when it was offered, obtain a running objection, or get a ruling on his objection outside the jury's presence, he failed to properly preserve error regarding the admission of the complained of testimony. *See Lopez*, 253 S.W.3d at 684; *Ethington*, 819 S.W.2d 858–59; *see also*

6

Tex. R. Civ. P. 33.1. Accordingly, we do not reach the merits of Luna's issue. Having determined Luna failed to preserve error, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on June 3, 2019
Opinion Delivered August 21, 2019
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.